## Staunton.

McKennie and Others v. Charlottesville and Albemarle Railway Company and Others.

September 9, 1909.

1.  Municipal Corporations—*Power to Compromise Disputed Claims—Arbitration—Consideration.*—A municipal corporation has the right, as a necessary incident to its right to contract and to sue and be sued, to settle and adjust unascertained or disputed claims made against it, or made by it against others. It may also submit such claims to arbitration, and the award, when fairly made, is binding on the corporation. In either case the controversy over the claim furnishes all the consideration necessary.

2.  Arbitration and Award—*Award Outside Submission—Severance.* In an arbitration between a city and a street railway company as to the amount due by the latter for street paving, if the award goes beyond the submission and undertakes to exempt the railway company from all obligations under the city ordinances, or the charter, to repair the pavement on each side of its rails for a period of five years, this part of the award is bad, but is separable from the residue and should be stricken out.

3.  Municipal Corporations—*Franchises—Release from Liability—Publication—Code, Sec. 1033-f, cl. 5.*—Under the provisions of section 1033-f, cl. 5 of the Code (1904) declaring that no amendment to a city ordiance granting a frachise shall be made which releases the grantee, or his assignee, from the performance of any duty required by the ordiance granting the franchise, unless notice thereof be given to the public by advertising the same for ten days in a newspaper published in the city, the council of the city have no right, without such advertisement, to enter into a contract with a street railway company upon which there is a continuing obligation to do street paving, to accept from it a designated sum of money "in full satisfaction and discharge of all obligation and liability of the company for street paving under its franchises."

4.  Arbitration and Award—*Grounds for Setting Aside Award.*—It is equally the rule of equity as of law that the reason for setting aside an award must appear on its face, or there must be misbehavior in the arbitrators, or some palpable mistake.

Appeal from a decree of the Corporation Court of the city of Charlottesville.    Decree for the complainants.    Defendant appeals.

*Affirmed*

The opinion states the case.

*George E. Walker* and *C. W. Allen,* for the appellants.

*Harmon & Walsh* and *Moon & Fife,* for the appellee.

Keith, P., delivered the opinion of the court.

A bill was filed by McKennie and others, citizens and taxpayers of the city of Charlottesville, against the city of Charlottesville and the Charlottesville and Albemarle Railway Company, which was taken for confessed as to the city, and to which the railway company filed its demurrer and answer.

The material facts appearing in the record are as follows: As early as 1886 a franchise was granted to the Charlottesville and University Street Railway Company to operate a street railway over and upon the streets of Charlottesville.    One of the conditions of the grant was that the space between the rails and for one foot on each side of the track should be kept in order by the railway company.    In January, 1894, a right of way and franchise was granted to the Piedmont Construction and Improvement Company, upon the condition, among others, that the said company would build and continuously operate the line described, and that "the said company shall be required to keep in order the streets within their rails and for eighteen inches on the outside with the same materials as is used in the streets, or equal to that the city uses, with the consent of the council and under the direction of the street commissioner"; and that "at the intersection of each and every cross street that crosses their track said track shall be so ballasted and maintained that easy and safe crossing is assured to all vehicles."

The Charlottesville and Albemarle Railway Company acquired the property and franchises of the two companies named above, is entitled to enjoy the rights conferred, and is charged with the burdens imposed by the franchises aforesaid.

By an act approved March 3, 1900, the council of the city of Charlottesville was given the power to negotiate loans for the purpose of improving and lighting its streets, buying necessary real estate, erecting public buildings, and supplying the city with sewerage. Under this statute an election was held, and a bond issue of $80,000 was decided upon by the voters and taxpayers of the city to carry out these improvements. The city council appointed a committee, consisting of four members of the council and three citizens, whose duty it was to make all contracts for street improvement. The committee was required to employ a competent engineer to supervise said improvements, and to submit its acts to the council for ratification or rejection. This committee was known as the "Special Street Improvement Committee."

The engineers employed to supervise the work in February, 1903, reported to the committee that in their opinion the whole work of street improvement would cost the sum of $77,000, but from this sum should be deducted the sum of about $14,000, which would be due from the street car company for its portion of the work. The railway company denied that there was any liability upon it to do any part of the said work, or that the city had any claim on it by reason of, or growing out of, the said street improvement, representing that in 1896 it had paid its portion of the cost of macadamizing Main street, and had procured from the city a receipt in full for all claims for such work in the future.

Negotiations were then entered into between the street committee and the railway company, then known as the Charlottesville City and Suburban Railway Company, which resulted in a contract being entered into between the city and the company, which was agreed upon and formally executed on October 9,

1903, and formally ratified by the council on October 10, 1903. By the terms of this contract it was agreed, among other things, that "When the work of paving Main street shall be completed in accordance with the plans and specifications of the city engineer, and as hereinbefore provided, the company will pay the city the sum of $5,000.00, and the payment of the same will be in full satisfaction and discharge of all obligation and liability of the company for street paving under its franchise, but will not, of course, affect its obligation as to keeping in order the portion of the streets occupied by it as provided in said franchise."

Upon the completion of this work the street car company refused to pay the $5,000 agreed upon, upon the ground that the work had not been done in accordance with the contract; and thereupon negotiations between the company and the city were set on foot, and on the 23d of March, 1905, the whole matter in controversy between the railway company and the city was submitted to arbitration.

The terms of submission were as follows:

"The city of Charlottesville and the Charlottesville and Albemarle Railway Company are at issue on the following questions:

"(1) What damage, if any, has resulted to the city of Charlottesville from the injury to its Main Street pavement adjacent to the rails of the said railway from the wheels of the cars.

"(2) What amount is due the city of Charlottesville for paving the track of said railway within the corporate limits of said city under contract of the 9th of October, 1903, taking into account such offsets and deductions, if any, as the railway company may be entitled to.

"The said city of Charlottesville and the said Charlottesville and Albemarle Railway Company desire to end all said controversies between them by referring all of their said differences, as set out above, or such of them as may exist on the 30th day of March, 1905, to arbitration.

"Therefore, this agreement between the said city of Charlottesville of the first part, and the said The Charlottesville and Albemarle Railway Company of the second part:

"Witnesseth: That the matters in controversy between the said parties are hereby referred to the arbitrament and award of Judge John M. White and Col. T. M. R. Talcott, with liberty to said arbitrators, before they enter on the said arbitration, to choose an umpire, who shall decide any and all of the questions of difference between the parties hereto if said arbitrators fail to agree.

"Said arbitrators and their umpire shall meet in the council chamber in Charlottesville, at some time to be fixed by them, not later than the 10th day of May, 1903 [1905], and after hearing such evidence as the parties hereto may adduce, and making such examinations as they may wish, the said arbitrators or their umpire shall decide all of the matters in controversy between the parties hereto according to the legal rights of the parties as speedily as may be. Such final award not to be delayed beyond thirty days from said 10th of May, 1905.

"The award shall be made in writing, and as soon after being made as possible it shall be filed by the arbitrators with the clerk of the Corporation Court of Charlottesville, who shall thereupon and at once notify the said city of Charlottesville and the said Railway Company of the fact that said award has been filed in his office. Such notice to be served by the sergeant of the said city.

"On the first day of the next term of the Corporation Court of Charlottesville, immediately succeeding the date of such filing, said award shall be presented in court by the said clerk, and unless good cause, as set out in 4 Min. Inst. (3d Ed.) part 1, p. 185-188, be shown against it by one or both of the parties hereto, the same shall be entered up as the judgment of said court without further delay.

"But if good cause be shown against said award, which in the opinion of the said court demands any change in the same,

then the said court shall make such change as to it may seem proper, and the award thus amended shall be entered as the judgment of the court.

"And the parties hereto agree and bind themselves to abide by the judgment of the court thus entered as final and conclusive, neither party to have the right of appeal therefrom.

"The costs of said arbitration, including the costs accruing after the filing of said award, and up to and including the final judgment of the court, shall be borne equally by the parties hereto.

"Witness the following signatures and seals this 23d day of March, 1905."

It appears that the arbitrators designated William E. Cutshaw, of Richmond, as umpire, and that he signified his acceptance by his signature.

On the 3d of May, 1905, the arbitrators filed a paper as follows:

"The undersigned arbitrators and umpire having heard the evidence and statements of counsel in reference to the matters of controversy between the city of Charlottesville and the Albemarle Railway Company, submitted to them for their determination, and having considered the same, are of opinion and do decide and award that the said railway company pay to the said city of Charlottesville the sum of twenty-five hundred dollars, with interest from date till paid, in full satisfaction of all matters submitted to us—except that the said railway company is released from all obligations under the city ordinance or the charter to repair the pavement on each side of its rails for a period of five years."

This award having been filed on May 3, 1905, the council met and determined to resist it, and authorized the employment of counsel, who filed a bill, not in the name of the city as plaintiff, but in that of three taxpayers of the city. The bill attacks the contract of October 9, 1903, upon two grounds: That it lacks

valuable consideration; and that there was no advertisement as provided by section 1033-f of the Code of Virginia.

The Corporation Court, in its opinion, disposes of these two questions as follows: "A valuable consideration is defined by Story on Promissory Notes as consisting 'in some right, interest, profit or benefit accruing to the party who makes the contract, or some forbearance, detriment, loss, responsibility, or act, labor, or service on the other side.' At the time of this contract the street car company denied any liability to the city, and there was and still is a dispute as to how much of the track the ordinances required the company to pave. A new rail was agreed to be put down by the company at the cost of ten thousand dollars, and the location of the track was changed. All these matters were covered by the contract, and it seems to me furnished a valuable consideration for a valid adjustment and agreement.

"But a Virginia statute is cited to the effect that 'no amendment or extension of any such franchise, right or privilege that now exists, or that may hereafter be authorized, which extends or enlarges such franchise, right or privilege, either as to the time during which it is to last or as to the territory in which it is to be enjoyed, shall be granted by any city or town unless the provisions of this act shall have been complied with; and no amendment that releases the grantee, or his assignee, from the performance of any duty required by the ordinance granting the franchise, or that authorizes an increase in the charges to be made by such grantee or assignee, for the use by the public of the benefits of such franchise, shall be granted unless and until notice of such proposed amendment shall be given to the public by advertising the proposed amendment for ten days in some newspaper published in the city or town.' (Section 1033-f, cl. 5.)

"It is strenuously insisted that the contract of October 9, 1903, was invalid because of the lack of the ten day's advertisement required by the above law, that the contract released the street car company from the performance of a duty, to-wit: the

payment of a larger amount than five thousand dollars ($5,000), and that the lack of the advertisement was fatal.

'I have examined the contract carefully, and, except in one particular, I can find in it nothing more than an adjustment of many differences. The council surely had the right to ascertain the precise amount which was due·by the street car company, to receive such amount, and to execute a valid receipt for it. This power was necessarily lodged somewhere. That it must have existed somewhere is shown by the fact that there are in the pleadings in this case three distinct and different statements of this amount, two of them by the plaintiffs. The city's claim is put at something over fourteen thousand dollars. It is again, by the same plaintiffs, put at twelve thousand four hundred and thirty-nine dollars. In another calculation, based on paving only one foot on each side of the rail, it is put at something over eight thousand dollars. The power to adjust these differences and settle them, validly and finally, must have been lodged somewhere, and that somewhere is, in my opinion, in the regularly constituted governing authorities of the city. . . . . . .

"I cannot see in this contract, except in one particular, anything more than an adjustment of money differences by parties mutually interested in such adjustment and empowered to make it. The city may have made a bad adjustment—that is not a subject of interest now—but in the opinion of the court it made an adjustment which it was empowered to make, except in one particular. The contract undertakes to make the payment of the five thousand dollars 'in full satisfaction and discharge of all obligation and liability of the company for street paving under its franchise.' This does come into conflict with the statute above referred to, if, as the court is inclined to think, the street paving is a continuing obligation. Defendant asks that this clause be striken out of the contract if the court finds it necessary to do so in order to maintain the validity of the contract. The court does find it necessary, and this language

should be expressly stricken out by the decree to be entered in this cause.

"The award of the arbitrators is also attacked in this case. By the terms of the submission, the corporation court was empowered to amend it. This power, in the judgment of the court, does not extend to a review of the whole controversy, but simply to an amendment in any particular in which the award may be illegal, 'as set out in 4 Min .Inst. (3d Ed.), part 1, p. 185-186.'

"In my opinion that portion of the award which says, 'except that the said railway company is released from all obligations under the city ordinance or the charter to repair the pavement on each side of its rails for a period of five years,' is clearly illegal. It is outside of the submission, and, in addition, undertakes to repeal city ordinances, or rather to do away with duties required by them. The defendant opposed this view, but insisted that if this portion of the award is held to be bad, yet it is severable, and should be stricken out without prejudice to the plaintiffs or the city, leaving the residue of the award to stand. The court is of opinion that this portion of the award must be stricken out."

And the decree appealed from was entered in occordance with this opinion.

That there was an honest difference between the city of Charlottesville and the railway company as to their respective rights, duties and liability, there can be no doubt; and authority is abundant, if authority for such a proposition were needed, that the city has a right to settle and adjust unascertained or disputed claims made against it, or made by it against others, as a necessary incident to its right to contract and to sue and be sued.

In *Prout* v. *Inhabitants of Pittsfield,* 154 Mass, 450, 28 N. E. 679, it was held, that although the claim against the city might not have been originally valid, yet it furnished a good consideration for the settlement.

In 1 Dillon on Mun. Corp., sec. 477, it is said: "Growing out of its authority to create debts and to incur liabilities, a municipal corporation has power to settle disputed claims against it, and an agreement to pay these is not void for want of consideration. If it has obtained a contract which, by mistake or a change of circumstances, it deems to operate oppressively upon the other party, an agreement to make an additional compensation, or modify or annul it, is not invalid for want of consideration."

It was held in *Town of .Petersburg* v. *Moppin,* 14 Ill. 193, 56 Am. Dec. 501, that the power to sue and be sued give to a corporation the right to settle or compromise claims.

In *Grimes* v. *Hamilton County,* 37 Iowa 153, the court said: "The power to prosecute suits on behalf of a corporation includes the power to settle the same. So, the power to defend suits brought against a corporation gives them the same power of adjustment. They may compromise doubtful controversies to which the corporation is a party, either as plaintiff or defendant. The law vests them with discretion in such matters, which they are to exercise for the best interests of the corporation. The settlement of an existing controversy, if made in good faith, binds the corporation, but if collusively made, it is not obligatory."

By section 3006 of the Code it is provided that "Persons desiring to end any controversy, whether there be a suit pending therefor or not, may submit the same to arbitration, and agree that such submission may be entered of record in any court. Upon proof of such agreement out of court, or by consent of the parties given in court, in person or by counsel, it shall be entered in the proceedings of such court, and thereupon a rule shall be made that the parties shall submit to the award which shall be made in pursuance of such agreement."

And by section 3009 it is provided that "No such award shall be set aside,. except for errors apparent on its face, unless it appear to have been procured by corruption or other undue means,

or that there was partiality or misbehavior in the arbitrators or umpires, or any of them. But this section shall not be construed to take away the power of courts of equity over awards."

It is equally the rule of equity as of law that the reason for setting aside an award must appear on its face, or there must be misbehavior in the arbitrators, or some palpable mistake. *Wheatley* v. *Martin's Admr.*, 6 Leigh 62.

From the institution of street-car service in the city of Charlottesville differences seem to have arisen between the city and the railways. These differences reached their climax when the city undertook a comprehensive system of street improvement and attempted to ascertain and determine the proportion of the cost of those improvements which was to be borne by the railway company. There can be no doubt that there was an honest difference of opinion between the parties, which constituted, as was shown by the opinion of the Corporation Court, a sufficient consideration for the contract entered into. There is no suggestion of bad faith or collusion between the parties. The award was made by able and upright arbitrators, and their conclusions have been scrutinized and corrected by a careful and upright judge. The authority of the city of Charlottesville to require the railway company to discharge all of the duties imposed by its franchise, or which, in the due exercise of its lawful power, it may hereafter see fit to impose, is in no respect compromised or diminished by the decree complained of, which we are of opinion should be affirmed.

*Affirmed.*