PLYMOUTH COUNTY, Appellant, v. R. J. KOEHLER, Guardian of property of Robert Gardner, Appellee.

No. 43086.

MAY 5, 1936.

E. P. Murray, for appellant.

Roseberry & Roseberry, for appellee.

DONEGAN, C. J.—On November 17, 1933, plaintiff county instituted this action against Robert Gardner and R. J. Koehler, his guardian, to recover the sum of $6,424.96, balance claimed to be due for the care of said Robert Gardner, an incompetent, at the State Hospital for Insane, from August 28, 1889, to June 30, 1933. Defendants answered, denying the allegations of the petition, and alleging that in 1904, it was agreed between the guardian of Robert Gardner, the incompetent, and the board of supervisors of plaintiff county, that the said board would accept the sum of $2,000 in full settlement of any claim said county might have for the maintenance of said incompetent as an inmate of the State Hospital for Insane, in so far as any of the property of said Gardner or his guardianship estate was represented by a certain quarter section of land therein described, or the proceeds thereof, or any other property purchased with such proceeds; that the said sum of $2,000 was paid; that all of the assets remaining in said guardianship were the proceeds of the sale of said quarter section and the investment of same, and have been relieved from the obligations declared on by plaintiff; and that there are no other assets in the estate from which the same could be paid.

Defendant guardian also filed a motion asking that the cause of action declared on be transferred to the probate division of the court for hearing, alleging that the case could only be heard as a claim in probate. Plaintiff filed a reply in which it stated that, at the time of the making of the alleged compromise agreement in 1904, plaintiff was not advised of the true status and value of the real estate and property owned by the said Robert Gardner, incompetent; that the said property was worth approximately $10,000, subject to a mortgage for approximately $1,800, and to judgments of the plaintiff for the support of said incompetent in the sum of approximately $2,300; that the estate of said incompetent was well able to pay the expenses to be incurred in the support of said incompetent at said insane hospital; that the guardian in making said attempted compromise was not acting in good faith with the plaintiff; that at the time of said alleged settlement the board of supervisors were without power or authority to compromise or settle any future claims that the said county might have for moneys thereafter expended for the support of said Robert Gardner at said insane hospital; and that said purported settlement was null and void. The case was tried to a jury, and, at the close of all the evidence, defendants moved the court to take from the jury the issues raised by plaintiff's reply, as to the bad faith and fraud of defendant and the lack of power on the part of the board of supervisors to make the compromise settlement. Defendant further moved that the jury be allowed to pass only on the question of the establishment of the claim of plaintiff as against the guardianship; that the court withdraw from the jury any right to impress such claim upon the present assets of the guardianship; and that the assets in the hands of the guardian be declared to be exempt from any liability for said claim. The plaintiff asked for instructions to the effect that the guardian, in making the alleged settlement, was bound to act in good faith and required to make a full and complete disclosure of the assets belonging to the guardianship; that the board was bound to act in good faith; that the jury should take into account whether the ward had sufficient property with which to have paid said claim or any claim for future moneys expended; and that, if the jury found that the guardian had not acted in good faith and had failed to make a full and complete disclosure, or if they found that the board did not act in good faith, the settlement should be set aside.

The court instructed the jury to return a verdict finding for the plaintiff in the sum of $6,183.04, for balance due on payments made for the care of said Gardner after June 30, 1904; that the board of supervisors of Plymouth county acted in good faith in making the settlement; that by reason of such settlement said board relieved from liability, for the future support of said incompetent, the quarter section of land referred to therein, or the proceeds from the sale thereof, or any other property purchased or acquired with such proceeds; that the assets in the hands of the guardian represent proceeds derived from the sale of said land, or property purchased or acquired with such proceeds, and were relieved from liability for the debt established against the guardian; but that no other property then owned or which might thereafter become the property of the ward was relieved from the obligation hereby established.

The court also entered an order in the probate proceeding in the guardianship of said incompetent, finding that all of the property in the hands of the guardian of said incompetent were proceeds of the sale of the said real estate; that the same were exempted from the claim of said county; and that the guardian should not resort to or use any of such assets for the payment of the said claim of Plymouth county. Thereafter, the plaintiff filed exceptions to the court's instructions, a motion in arrest of judgment and for new trial, and a motion for judgment notwithstanding the verdict, all of which were overruled by the court. From such rulings, the plaintiff appeals.

Stated briefly, the grounds upon which it is alleged that the court erred are: (1) That the board of supervisors was without authority to make the alleged compromise settlement; and (2) that the court should have submitted to the jury the question of the good faith of the settlement.

I. Much time is spent in argument and numerous authorities are cited in support of appellant's contention that the board of supervisors of Plymouth county was without authority to make the compromise settlement and agreement here in question. Practically all of such argument and citation of authorities, however, go to the proposition that the board of supervisors could not make an agreement with the guardian of Robert Gardner in 1904, by which Gardner's estate would be relieved from the claim of the county for such sums as the county might later spend for his care at the insane hospital. The verdict which the

trial court directed the jury to render specifically found and established the claim of the appellant against the guardianship in the sum of $6,183.14, with interest at 6 per cent per annum. No appeal has been taken by the defendants from this finding, and it may, therefore, be considered as a verity. The court, however, further directed the jury to find that, by reason of the compromise settlement made in 1904, the board of supervisors of Plymouth county relieved from liability, for the future support of said incompetent, the quarter section of land here involved, or the proceeds from the sale thereof, or any other property purchased or acquired with such proceeds, and that the assets in the hands of the guardian represented the proceeds or property purchased or acquired with such proceeds. It is this part of the directed verdict with which we are concerned in this appeal. No question has been raised as to the propriety of presenting such question in this action, and we shall confine ourselves to a discussion of the question thus presented.

The rule is well established and is, in fact, supported by some of the cases cited by the appellant, that a board of supervisors does have authority to enter into compromise agreements. Grimes v. Hamilton County, 37 Iowa 290; Mills County v. Burlington & M. Ry. Co., 47 Iowa 66; Collins v. Welch, 58 Iowa 72, 12 N. W. 121, 43 Am. Rep. 111; Allen v. Cerro Gordo County, 34 Iowa 54. The question with which we are here concerned is: Were the matters involved in the agreement between the board of supervisors and the guardian of the incompetent such that the board could validly relieve the 160 acres of land or its proceeds from claims of the county for future support of the incompetent in whose name the title to such land then stood? In order to determine this question, a brief statement of the facts is necessary.

Some time prior to 1889, the 160 acres of land here involved were purchased and title taken in the name of Robert J. Gardner. The evidence is undisputed that at the time of this purchase $640 of the purchase price was paid by Robert J. Gardner and $640 by his wife, Harriet Gardner, and that a mortgage for the unpaid balance of the purchase price was executed by them. Gardner, with his wife and family, moved upon this land and made their home thereon. In 1889, Robert J. Gardner was committed to the Iowa State Hospital for Insane at Cherokee, and his wife, Harriet Gardner, was appointed guardian of his property. At

the time he was committed to the hospital, the wife was left with eight children, the youngest being born a short time after his commitment. Mrs. Gardner continued to live upon this farm for a few years thereafter, and she contributed further sums toward its improvement. In 1902, Plymouth county brought an action against Harriet Gardner, guardian of her husband's property, to recover $1,600 expended by the county for the support of her ward in the insane asylum from June, 1890, to March 31, 1901. Mrs. Gardner filed an answer and cross-bill in equity, alleging that she was the owner of a one-half interest in the 160 acres, that it included her homestead, that at the time of Gardner's commitment the total investment in said land did not exceed the value of the homestead, that the 40 acres constituting the homestead were exempt, that she was entitled to credit for payments which she had made on her husband's indebtedness after his commitment, that she was entitled to all the land, that the land was mortgaged, and that the part not constituting the homestead should first be exhausted in payment of the mortgage indebtedness. On motion of the county, a part of this answer was stricken, and, on the trial of that case, the county obtained a judgment for $1,600, and costs. In October, 1903, the county obtained a further judgment for $324 and costs, for further sums expended for Gardner's care. On December 1, 1903, one E. H. Dalton recovered a judgment against her as guardian for $77.03 and costs. In the meantime, one C. E. Flaugher, the holder of the mortgage on the land, had commenced a foreclosure action and recovered judgment for $1,795.41, and, at the sale under the foreclosure, the land had been purchased by him. In December, 1903, the land was also sold for the unpaid taxes for the year 1902. On June 10, 1904, the board of supervisors of Plymouth county passed a resolution which recited the recovery of the judgments above referred to, the decree of foreclosure and sale thereunder, the fact that Gardner or his guardian had not redeemed or paid the judgments of the county, that the county was willing to redeem from said sale and to hold the property and credit the debtors with the full amount due on the two judgments. After authorizing the county auditor and county attorney to redeem from the sheriff's sale and to credit the amount of the county's judgment against Gardner and his guardian, the resolution contained the following statement: "Be it further resolved by the Board of Supervisors of said County

that the County Attorney be and he is hereby authorized and directed to release the judgments of the County hereinabove referred to upon the payment of $2,000.00 to the Treasurer of said County by said Rob't. J. Gardner or his legal guardian, on or before Aug. 26, 1904, said judgment to be in full of all charges for support of said Rob't. Gardner to date and in consideration of the payment of said $2,000.00, the said County of Plymouth does hereby relieve from liability for the future support of said Rob't. J. Gardner the said N. E. ¼ Sec. 18, Twp. 92, Range 46, or the proceeds thereof, or any other property purchased or acquired with such proceeds, but as to any other property now owned or that may in the future become the property of said Rob't. J. Gardner, the same shall not be relieved from such support, unless purchased or acquired with the proceeds of the real property aforesaid.''

Shortly after the passage of the above resolution, Harriet Gardner resigned as guardian, and the present guardian, R. J. Koehler, was appointed to succeed her. On the 2d day of July, 1904, Koehler, as guardian, filed his petition to sell or mortgage the land in question. This petition recited the two judgments held by the county, the mortgage foreclosed, and purchase of the property by Flaugher, the sale of the premises for taxes for 1902, and that the county had an additional claim for the support of Gardner which had not been reduced to judgment. The petition then referred to the proposition contained in the resolution passed by the board of supervisors, recited that the land was of the reasonable value of $55 to $60 per acre, and asked for an order authorizing the guardian to sell or mortgage said land, to redeem from the foreclosure, and to compromise the judgments and claim of the county against the same. An order was issued authorizing the sale of the land, and, pursuant thereto, the land was sold for $9,600. Out of the proceeds the guardian satisfied the judgment and costs of Flaugher on the foreclosure, and the judgment of Dalton, paid the county $2,000 in settlement pursuant to the resolution of June 10th, paid the taxes for which the property had been sold, paid costs and expenses connected with the guardianship and sale, paid $2,000 to Harriet Gardner pursuant to an order of court, and had left on hand a balance of $2,875.80. It appears from the evidence that this balance was invested by the guardian and that at the time of the trial of this case this

balance, with its accumulations, amounted to approximately $5,500.

 Leaving out of consideration for the moment the question of good faith and fraud, we are unable to see why the board of supervisors did not have the power to make the compromise settlement and agreement entered into. This agreement did not release the estate of the incompetent from claims that might arise for his future support at the insane hospital. All it purported to do.was to release the particular tract of land, the proceeds derived from the sale thereof and from the future investment of such proceeds, from such future claims as the county might have for the support of the incompetent. Under the record before us, the board of supervisors reasonably might have felt that if the claims of Harriet Gardner for the amount originally invested in said land, for later improvements made thereon, for her homestead right therein, and for amounts expended in support of the children, were set up and prosecuted to a final determination, the county might find itself with little or no property against which to enforce its judgments for the amounts already expended in support of the incompetent. We see no reason why the county, under such circumstances, could not avail itself of the opportunity to obtain the substantial sum of $2,000, and, as a consideration therefor, release, not the estate of the incompetent, but this particular land and its proceeds from all future claims for the support of the incompetent. None of the cases cited by the appellant involved this kind of a situation. None of them went further than to hold that the board of supervisors was without authority to release the incompetent person or his estate from claims which had not already accrued. The county having obtained the $2,000 in consideration of the release of this particular property and its proceeds from future claims, when without such agreement it might not have obtained anything, we think it would be a perversion of justice to hold that, after thirty years have elapsed, the county could now deny its power to make the agreement, retain the money secured by it, and subject to the payment of its claims the property which it agreed to release.

II. It is claimed by the appellant, however, that, even if it be assumed that the board of supervisors had the power to make such agreement, there was evidence that such agreement was the result of bad faith and fraud on the part of the appellee.

and his guardian, and that the cause should have been submitted to the jury for this reason. The evidence of bad faith upon which appellant relies is the fact that at the very time this settlement was made the guardian knew that the land was worth $9,600; that after all the judgments, costs, and liens, other than the county's judgments, had been paid, the funds on hand were sufficient to pay the claims the county then held and a large part of the claims which might thereafter accrue; and that the evidence fails to show that the guardian made any disclosure of these facts to the board of supervisors.

**■■** There is nothing in the situation involved at the time the compromise was made to show any fiduciary relation between the incompetent or his guardian and the board of supervisors. The agreement pleaded by the guardian in this case, under which he claimed that the property in his hands was released from the claim of the county sued on herein, was not denied by the appellant. Appellant filed a reply in which it was claimed, as we have already indicated, that such agreement was void because the board of supervisors had no authority to make the same, and that it was obtained as the result of bad faith and fraud. The ordinary rule is that he who alleges fraud must prove it, and no authority has been cited by the appellant to show that such rule does not apply in this case. The burden was, therefore, upon the appellant to prove the fraud and bad faith alleged in its reply. There is no direct proof in the record of any word said or act done by the guardian that would support the charge of fraud. The contention is that the facts and circumstances were such as to make the existence of fraud a question for the jury. With this contention we cannot agree. The guardian in his application for authority to sell the real estate expressly stated that it was worth from $55 to $60 an acre. In the report filed by him showing the distribution made of the proceeds of the sale of the land, he expressly stated that the proceeds of the land amounted to $9,600; that $2,000 of this amount had been paid to Harriet Gardner under order of court, and that a balance of $2,875.80 remained in the guardian's hands. Both the application for the sale of the land and the report of the distribution of the proceeds were filed before the compromise agreement was finally executed. It cannot be assumed that the members of the board of supervisors were not

aware of the value of this land, or that they were ignorant of the amount for which it was sold. Moreover, the evidence as to the situation existing at the time the compromise agreement was made is at least sufficient to show that Harriet Gardner was asserting claims to ownership of the land, to homestead rights therein, to amounts expended in its improvement, and to amounts expended in caring for the eight children of the incompetent. There is no presumption that the board of supervisors violated its duty. In fact, the presumption is that the board of supervisors, as officers intrusted with the county's property, performed its duty. Instead of the facts and circumstances relied upon by the appellant showing a failure of the supervisors to perform their duty, or that they were the victims of fraud practiced by the guardian, we think these facts and circumstances are sufficient to indicate that the board, in the exercise of its discretion, made what might be considered a favorable bargain for the county.

We find no reason for disturbing the verdict rendered pursuant to the court's instruction, or the order entered by the court pursuant thereto. The orders of the trial court appealed from are, therefore, affirmed.—Affirmed.

All Justices concur.